# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIMON OGUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0869-AGB |
| | ) | |
| SPORTTECHIE, INC., TAYLOR | ) | |
| BLOOM, FRANCESCA BODIE | ) | |
| (A.K.A. FRANCESCA LEIWEKE- | ) | |
| BODIE), DANIEL KAUFMAN, AND | ) | |
| OAK VIEW GROUP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  October 10, 2019
Date Decided:  January 31, 2020

T. Brad Davey and Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Gregory A. Markel, SEYFARTH SHAW LLP, New York, New York; Tonya M. Esposito, SEYFARTH SHAW LLP, Washington D.C.; *Attorneys for Plaintiff Simon Ogus.*

Art C. Aranilla, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C., Wilmington, Delaware; *Attorney for Defendants Taylor Bloom, Francesca Bodie, and Daniel Kaufman.*

Brian M. Rostocki, Benjamin P. Chapple, and Justin M. Forcier, REED SMITH LLP, Wilmington Delaware; Michael S. Leib, REED SMITH LLP, Chicago, Illinois; *Attorneys for Defendants SportTechie, Inc. and Oak View Group, LLC.*

**BOUCHARD, C.**

In this action, Simon Ogus asserts that defendants conspired to remove him from SportTechie, Inc., a company he co-founded, eliminate his 44.5% interest in the company through a multi-step plan in order to enrich themselves, and transfer control of the company to Oak View Group, LLC, a private equity and venture fund. Pending before the court is defendants' motion to dismiss seven claims for fraud, breach of fiduciary duty, aiding and abetting, civil conspiracy, and breach of contract. For the reasons explained below, the court grants the motion in part and denies it in part.

## I.       BACKGROUND

The facts recited in this opinion come from the Verified Amended Complaint (the "Complaint") and documents incorporated therein. Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

### A.       The Parties

SportTechie, Inc. ("SportTechie" or the "Company") is a Delaware corporation with its principal place of business in Washington, D.C.[1] SportTechie is a news source that reports on the technology aspects of sports. Plaintiff Simon Ogus is a founder of SportTechie and was its Chief Operating Officer until March 8, 2017.

---

[1] Unless otherwise noted, the court refers to SportTechie, Inc. and its predecessor entities as "SportTechie" or the "Company" for simplicity.

Defendant Taylor Bloom is a founder, stockholder, director, and officer of SportTechie. He is currently the Chief Executive Officer of SportTechie.

Defendant Daniel Kaufman is an employee, officer, and stockholder of SportTechie. He was the sole in-house attorney at SportTechie at all relevant times and currently serves as Managing Director of SportTechie.

Defendant Oak View Group, LLC ("Oak View") is a Delaware limited liability company that is a controlling investor in SportTechie.[2] Defendant Francesca Bodie is a director of SportTechie as a designee of Oak View, and is currently the President of Business Development for Oak View.[3]

## B. The Origins of SportTechie

In early 2012, Ogus founded the predecessor of SportTechie with Josh Folk, who left the Company in 2014.[4] In April 2012, Ogus hired defendant Bloom to write content for the company.[5]

In August 2013, SportTechie became a District of Columbia limited liability company.[6] Around this time, Bloom received an ownership share in SportTechie.[7]

---

[2] Am. Verified Compl. ("Compl.") ¶ 21 (Dkt. 30).

[3] *Id.* ¶ 19, 140.

[4] *Id.* ¶¶ 22, 24.

[5] *Id.* ¶ 23.

[6] *Id.* ¶ 24.

[7] *Id.*

In October 2015, SportTechie became a Delaware limited liability company.[8] In 2016, Bloom and Ogus revised SportTechie's Operating Agreement (the "2016 Operating Agreement") and renegotiated their ownership of the Company so that Bloom would receive 55.5% of the units and Ogus would receive 44.5% of the units of SportTechie.[9]

Under the 2016 Operating Agreement, Ogus was the sole manager of SportTechie and had a right as a member to block "Major Decisions" by the Company (the "Veto Right"), which needed "the approval of all the Members."[10] The 2016 Operating Agreement also provided that a member, including Ogus, only could be expelled if a court found that such member engaged in certain acts of serious misconduct:

> A Member may be expelled only if such Member has been found by a court of competent jurisdiction to: (a) be guilty of wrongful conduct that adversely and materially affects the business or affairs of the Company; (b) have willfully or persistently committed a material breach of the articles of the organization of the Company or this Agreement; or (c) have otherwise breached a duty owed to the Company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with the Member.[11]

---

[8] *Id.* ¶ 27.

[9] *Id.* ¶ 28.

[10] *Id.* ¶ 6, 29; *id.* Ex. A §§ 6.1, 6.5.

[11] *Id.* Ex. A § 8.2.

In July 2016, SportTechie hired defendant Daniel Kaufman as a Managing Director.[12] Kaufman became the sole in-house attorney for SportTechie in which capacity he advised Ogus and Bloom on legal issues.[13]

In August 2016, Vintage Capital invested $75,000 in SportTechie in the form of a convertible note.[14] Kai Sato, a friend of Bloom, had formed Vintage Capital as a venture capital company.[15] Sato introduced the Company to Francesca Bodie, Vice President of Business Development of the Oak View, a large venture capital firm.[16]

In October 2016, Oak View invested $675,000 in SportTechie in the form of a note convertible into common stock.[17] One condition of Oak View's investment was that it would have the "right to [have] a representative on SportTechie's yet-to-be formed Board."[18] Ogus consented to Oak View's investment in SportTechie, although the precise form of that consent and what Ogus knew when he did so is unclear from the Complaint.[19]

---

[12] Compl. ¶ 33.

[13] *Id.*

[14] *Id.* ¶ 38.

[15] *Id.* ¶ 36.

[16] *Id.* ¶ 39.

[17] *Id.* ¶ 41.

[18] *Id.*

[19] *See id.* ¶ 42.

### C. SportTechie Converts Into a Delaware Corporation and the Shareholders Agreement is Executed

In October 2016, Kaufman, Bloom, and Bodie started an internal campaign to convert SportTechie from an LLC to a Delaware corporation and to create a board of directors (the "Board") with Bloom and Bodie making up a majority of the Board.[20] Ogus' approval of the conversion was necessary given his Veto Right under the 2016 Operating Agreement.[21]

On or about December 29, 2016, Kaufman sent Ogus certain documents to implement the conversion.[22] On December 31, 2016, Ogus signed the conversion documents, and SportTechie became a Delaware corporation.[23] Also on December 31, Ogus signed a written consent of the stockholders of the new corporation "establishing the Board and appointing Mr. Bloom as the first director."[24] The Complaint contains no allegations suggesting that the Company's certificate of incorporation contained any provisions limiting the ability of the Board to manage the business and affairs of the corporation, including its authority to hire and fire

---

[20] *Id.* ¶ 44.

[21] *Id.*

[22] *Id.* ¶ 50.

[23] *Id.* ¶ 52.

[24] *Id.* ¶ 122.

5

officers and employees.[25] From December 31, 2016 until February 1, 2017, Bloom was the only member of the Board.[26]

On February 1, 2017, Ogus signed a written consent of stockholders appointing Bodie and Sato to the Board, which expanded the Board to three members.[27] Bloom had nominated Sato to serve on the Board and Bodie joined as the designee of Oak View under its convertible note agreement.[28]

On January 31, 2017, Bloom and Ogus executed a Shareholders Agreement.[29] The Shareholders Agreement gave SportTechie an option to purchase Ogus' shares within ninety days after the termination of his employment—"for any reason or for no reason"—at a purchase price "equal to the fair market value (as determined in good faith by the Board) of the Shares sold."[30]

The day after Ogus executed the Shareholders Agreement, Kaufman entered into a Restricted Stock Purchase Agreement with SportTechie to purchase 611,112 shares of the Company on the terms that allegedly were very favorable to Kaufman.[31]

---

[25] After oral argument, Ogus submitted a copy of the Company's certificate of incorporation and confirmed that it "did not contain relevant provisions limiting the Board's authority to manage the business and affairs of the Company." Dkt. 59 at 3.

[26] Compl. ¶ 53.

[27] *Id.* ¶ 122.

[28] *Id.* ¶¶ 58-59.

[29] *Id.* ¶ 67.

[30] *Id.* Ex. C. §§ 6.1, 6.2.

[31] Compl. ¶ 69.

### D. Ogus' Employment is Terminated and SportTechie Repurchases His Shares

In February 2017, Bloom and Kaufman engaged a valuation service provider, Derivitas LLC, to determine the fair market value of Ogus' shares in SportTechie to facilitate a potential buyout of his shares.[32] On March 8, 2017, Bloom and Bodie, acting by written consent on behalf of the Board, removed Ogus from his position as an officer of the Company and terminated his employment without cause.[33] The next day, Bloom handed Ogus a termination letter and several other documents, including an agreement to purchase Ogus' stock.[34] The termination letter stated that the value of the Company was $2.2 million, which "was at the low end of the Derivatas range of values."[35]

On May 9, 2017, SportTechie purported to repurchase all of Ogus' shares in the Company for a total of $819,951.35, with a check for ten percent of the consideration ($82,000) and a promissory note for the remaining balance ($737,951.35).[36] Ogus has not accepted any payments for his shares.[37]

---

[32] *Id.* ¶ 72.

[33] *Id.* ¶¶ 88, 93, 158; *see id.* Ex. F.

[34] Compl. ¶¶ 90-91.

[35] *Id.* ¶ 94.

[36] *Id.* ¶¶ 99, 102; *see id.* Ex. G.

[37] Compl. ¶ 102.

## II. PROCEDURAL HISTORY

On November 30, 2018, Ogus filed his original complaint in this action, which he amended on March 5, 2019 (as defined above, the "Complaint"). The Complaint asserts ten claims, for fraud (Count I), breach of fiduciary duty (Counts III and IV), aiding and abetting (Counts II and V), civil conspiracy (Count VI), wrongful termination (Count VII), declaratory relief (Count VIII), breach of contract (Count IX), and breach of the implied covenant of good faith and fair dealing (Count X).

On March 19, 2019, defendants filed a motion to dismiss the Complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. In connection with briefing and argument of the motion to dismiss, Ogus dropped three of his claims: Counts VII, VIII, and X.[38]

## III. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[39]

---

[38] Pl.'s Opp'n Br. 57 n.11 (Dkt. 43); Dkt. 59 at 5.

[39] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

8

### A. Count I: Fraud Against Bloom and Kaufman

Count I of the Complaint asserts a claim for fraud in the inducement against Bloom and Kaufman for making "misrepresentations and omissions of material facts in order to induce [Ogus] to (1) agree to converting SportTechie from an LLC to a corporation, (2) agree to a five-person Board, initially comprised of Bloom, Sato, and Bodie, and (3) execute the Shareholders Agreement."[40] During briefing, Ogus identified ten misrepresentations and six omissions that allegedly were part of this scheme.[41]

To state a claim for fraud in the inducement, a plaintiff must allege: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[42]

Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[43] "The relevant circumstances are 'the time, place, and contents of the false

---

[40] Compl. ¶ 107.

[41] *See* Pl.'s Opp'n Br. 18-20.

[42] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. Nov. 24, 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[43] Ch. Ct. R. 9(b).

representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation.'"[44] The key to determining whether a plaintiff has alleged circumstances with particularity to satisfy Rule 9(b) is that "the plaintiff must allege circumstances to fairly apprise the defendant of the basis of the claim."[45]

Defendants argue that Count I should be dismissed because Ogus failed to plead fraud with particularity under Rule 9(b). They further contend that certain alleged misrepresentations are non-actionable statements of opinions and that Ogus has failed to allege facts sufficient to establish justifiable reliance given that the Shareholders Agreement he signed "contains express provisions allowing SportTechie to repurchase Ogus' shares following his termination as an employee of the Company for 'any reason or no reason.'"[46]

Ogus' fraud claim relies on essentially three separate actions: (i) converting the LLC into a corporation on December 31, 2016, which eliminated Ogus' ability to veto major corporate actions and gave the Board the authority to terminate officers and employees, including Ogus; (ii) creating and expanding the Board from

---

[44] *Prairie Capital,* 132 A.3d at 62 (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 207-08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007)).

[45] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

[46] Defs.' Opening Br. 16 (Dkt. 36).

10

December 31, 2016 to February 1, 2017, which excluded Ogus and deprived him of having a voice in Board decisions; and (iii) executing the Shareholders Agreement on January 31, 2017, where Bloom and Ogus agreed that the Company could repurchase their shares upon the termination of their employment from the Company.

Although these three actions allegedly were conceived as part of an overall plan to eliminate Ogus' ownership interest in the Company, they can be considered separately in analyzing Ogus' fraud claim because they were not necessarily dependent on each other and had different consequences. For example, even after agreeing to convert the LLC into a corporation, which resulted in the elimination of Ogus' Veto Right, Ogus could have refused to enter into the Shareholders Agreement and prevented the Company from having the ability to purchase his shares after termination of his employment. For the reasons discussed next, the court finds that the Complaint states a reasonably conceivable claim of fraud against Bloom and Kaufman with respect to the first two actions described above but fails to do so with respect to the third.

First, the Complaint alleges specific facts demonstrating that Bloom and Kaufman induced Ogus to approve converting SportTechie from an LLC to a corporation by promising him—falsely—that he would retain the managerial role he

11

had with the Company as an LLC and the Veto Right he had under the 2016

Operating Agreement:

> On or about noon on December 29, 2016, Mr. Kaufman sent Mr. Ogus the conversion documents. At this time, during conversations with Mr. Bloom and Mr. Kaufman, Mr. Ogus was told that he would retain his managerial authority as COO, and remain involved in the day-to-day management of the Company. As co-founder and one of the two stockholders, Mr. Ogus was told he would retain the Veto Right over major Company decisions he had possessed before the conversion. . . . Mr. Kaufman further pressured Mr. Ogus by asserting that (i) Mr. Ogus would inhibit Company business if he did not approve the conversion documents in the short turn-around time, and (ii) Mr. Ogus would be personally responsible for any fall-out caused by his delay in giving his consent.[47]

The court disagrees with defendants' contention that this aspect of the alleged

fraudulent scheme is not plead with particularity. The allegations quoted above and

other allegations in the Complaint[48] provide sufficient details to apprise the

defendants of the basis for this aspect of Ogus' fraud claim. Specifically, the

allegations detail the content of the false representations; the time frame in which

they were made; the identity of the persons making them; and what Bloom and

---

[47] Compl. ¶ 50.

[48] *See id.* ¶¶ 46 ("Mr. Kaufman lied to Mr. Ogus by telling him that, under the proposed structural change, Mr. Ogus and Mr. Bloom would continue to lead SportTechie from a creative and operational standpoint after the conversion to a corporation and as a stockholder, Mr. Ogus would continue to maintain his Veto Right."); 47 ("Mr. Kaufman misrepresented to Mr. Ogus that under the proposed structure, any major business decision would require unanimous approval of all stockholders, including Mr. Ogus. Mr. Kaufman also advised Mr. Ogus that outside counsel agreed with him on the meaning and effect of the conversion documents.").

12

Kaufman gained from making the statements, *i.e.*, to terminate Ogus' employment with the Company and, assuming Ogus later would sign the Shareholders Agreement, to force him "to sell his equity interest at a price far below fair market value."[49]

Second, the Complaint alleges that Bloom and Kaufman falsely assured Ogus from November 2016 to February 2017 that he would be added to the Board of the Company shortly after the conversion:

> In November 2016, Mr. Kaufman and Mr. Bloom had initially proposed a three-person Board consisting of Mr. Bloom, Ms. Bodie and Mr. Sato. Mr. Ogus resisted being excluded from the Board which had a majority of Company outsiders. . . . Importantly, Mr. Kaufman promised Mr. Ogus that he would be added to the Board shortly after the conversion.[50]

> In January 2017, Mr. Bloom and Mr. Kaufman again falsely promised Mr. Ogus that he would become a member of the Board and would soon be joining Mr. Sato, Ms. Bodie, and Mr. Bloom as members of the Board.[51]

> In January 2017, Bloom and Kaufman promised Mr. Ogus for at least the third time that he would become a member of the Board and maintain his Veto Right.[52]

> In February 2017, Mr. Ogus asked Mr. Kaufman and Mr. Bloom who would be a good fit to be the *fifth* member of the SportTechie Board, assuming that based on prior promises, Mr. Ogus would be the fourth directors (the existing three seats were occupied by Mr. Bloom, Ms.

---

[49] *Id.* ¶ 2.

[50] *Id.* ¶¶ 47-48.

[51] *Id.* ¶ 54.

[52] *Id.* ¶ 60.

> Bodie, and Mr. Sato). In response, Mr. Kaufman and Mr. Bloom continued to misrepresent that Mr. Ogus would be made a member of the Board.[53]

The practical effect to Ogus of this aspect of his fraud claim is unclear given that the Complaint contemplates that Ogus would be only one member of a five-member Board, which could out vote him on any given matter, including the termination of his employment. Nonetheless, this aspect of the claim is pled with sufficient particularity to apprise the defendants of the basis for the claim.

With respect to the procuring Ogus' approval of the conversion and his exclusion from the Board, the Complaint goes on to plead the other elements of fraud. Specifically, the Complaint sufficiently alleges (i) that Bloom and Kaufman knew the above-referenced statements were false because they intended to fire Ogus and to eliminate his Veto Right and they did not intend to place Ogus on the Board; (ii) that Bloom and Kaufman nevertheless made the statements to induce Ogus to approve the conversion and to sign written consents approving appointments to the Board; (iii) that Ogus reasonably relied on their representations, which "were made by the Company attorney Mr. Kaufman and by [Ogus'] longtime partner Mr. Bloom" and, insofar as his Veto Right was concerned, because "the approval of stockholders for major decisions was consistent with the then-operative LLC agreement;" and

---

[53] *Id.* ¶ 71.

14

(iv) that these representations harmed Ogus by facilitating his termination from the Company and, ultimately, the repurchase of his shares at an allegedly unfair price.[54]

Focusing on the third action making up the alleged fraudulent scheme—execution of the Shareholders Agreement—Ogus has failed to state a reasonably conceivable claim for fraud. Although the Complaint is not a model of clarity, Ogus' grievance appears to be that Kaufman "withheld the fact that the purpose of the Shareholders Agreement was to make it possible for . . . the Board to terminate Mr. Ogus without cause and repurchase his shares."[55]

As an initial matter, the Shareholders Agreement did not "make it possible" for the Board to terminate Ogus as an officer or employee of the Company—with or without cause. The Board's authority to take such action post-conversion arose from its authority under the Delaware General Corporation Law and the Company's certificate of incorporation and bylaws.[56] The Shareholders Agreement simply

---

[54] *Id.* ¶¶ 110-11, 114-15, 117-18, 121-23.

[55] *Id.* ¶ 65. The Complaint further alleges that "Mr. Kaufman conveyed to Mr. Ogus that he needed the new Shareholders Agreement to 'button up' as SportTechie progressed as a Company." *Id.* This statement is not actionable because it is vague and, at most, is an expression of opinion. *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014) ("[P]laintiff generally cannot rely . . . on . . . expressions of mere opinion.") (citations omitted).

[56] *See, e.g.*, 8 *Del. C.* § 141(a) ("The business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.")

provides that "*[u]pon the termination* of [Ogus'] employment from the Company . . . (for any reason or for no reason)," the Company shall have the option to purchase his shares on the terms and conditions specified therein.[57] By its plain terms, this provision means that the Company could repurchase Ogus' shares once his employment was terminated, however that termination came about (*e.g.*, if the Board fired Ogus or if he resigned voluntarily), but does not *create* the right of the Board to terminate Ogus' employment.

More to the point, insofar as Ogus contends that Kaufman concealed that the Shareholders Agreement permitted the Company to repurchase his shares, such a contention cannot support a claim for fraud because this right is expressly set forth in the Shareholders Agreement that Ogus signed. As this court has held, "[i]t is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement."[58] The same logically holds true when purporting to rely on an alleged omission that contradicts the plain language of the contract at issue. Here, to repeat, the Shareholders Agreement expressly allowed the Company to repurchase Ogus' shares upon the termination of his employment with the

---

[57] Compl. Ex. C § 6.1 (emphasis added).

[58] *Flores v. Strauss Water, Ltd.*, 2016 WL 5243950, at *7 (Del. Ch. Sept. 22, 2016) (quoting *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006), *aff'd*, 993 A.2d 1249 (Del. 2007)); *see also MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *14 (Del. Ch. Dec. 30, 2010) (granting motion to dismiss fraud claim based on three oral statements that were expressly contradicted by a later contract).

Company. Thus, Ogus cannot complain that he was fraudulently induced to enter into the Shareholders Agreement based on Kaufman's alleged failure to disclose that his shares could be repurchased.

\* \* \* \* \*

In sum, the motion to dismiss Count I is granted in part and denied in part in the manner explained above.

### B. Count II: Aiding and Abetting Fraud Against Bodie and Oak View

Count II is an aiding and abetting claim against Bodie and Oak View for "substantially assist[ing] Defendants Bloom and Kaufman's fraudulent conduct" "[a]s set forth in Count I."[59] The elements of aiding and abetting fraud are: "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance."[60]

Ogus has satisfied the first element for the reasons discussed in the previous section. More specifically, Ogus sufficiently has pled two underlying instances of fraud: "misrepresentations and omissions of material facts in order to induce Mr. Ogus to (1) agree to converting SportTechie from an LLC to a corporation [and] (2) agree to a five-person Board, initially comprised of Bloom, Sato, and Bodie."[61] Ogus has failed, however, to plead sufficient *facts* to satisfy the second element of the

---

[59] Compl. ¶¶ 131, 142.

[60] *PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018) (internal citations and quotation marks omitted).

[61] Compl. ¶ 107.

claim, *i.e.*, that either Bodie or Oak View had knowledge of the alleged misrepresentations and omissions that form the basis of the fraud claim alleged against Bloom and Kaufman.

Citing paragraph 133 of the Complaint, Ogus asserts that "Count II alleges that Bodie and Oak View were aware of and participated in the entirety of Defendants' fraudulent conduct from October 2016 through March 2017."[62] The text of paragraph 133, however, is conclusory. It does not allege any *facts* demonstrating that Bodie or Oak View were aware of any false representations that Bloom and/or Kaufman made to Ogus or of any material omissions arising from their discussions. Rather, paragraph 133 states, in its entirety, that: "During the period from October 2016 through March 2017, Bodie and Oak View Group had knowledge of and actively participated in the fraudulent scheme detailed above and summarized in this count."[63]

Ogus argues that the "terms of the [convertible] note Bodie signed expose part of Bodie's and Oak View's knowledge and participation in the fraudulent scheme, as it specifically refers to the Board seat she would occupy . . . as well as the equity award to Kaufman."[64] But signing a document reflecting that Oak View would have

---

[62] Pl.'s Opp'n Br. 26-27.

[63] Compl. ¶ 133; *see also id.* ¶ 137 (asserting without supporting facts that "Bodie and Oak View Group were consulted often about managing the details of the fraudulent scheme").

[64] Pl.'s Opp'n Br. 27.

18

a representative on the Board as a condition of its investment in the Company—an unremarkable provision for a private equity firm investing in a startup—and that Kaufman would receive an equity award does not equate to knowledge of fraudulent conduct.[65]

At bottom, Ogus argues the court should infer that Bodie and Oak View were aware of the fraud that Bloom and Kaufman allegedly perpetrated because Oak View wanted to "obtain a controlling financial interest" in the Company.[66] Oak View allegedly accomplished this objective through a plan that involved (i) the conversion of the Company from an LLC to a corporation, (ii) the creation of a new Board that excluded Ogus, and (iii) the implementation of the Shareholders Agreement.

Once again, the flaw in Ogus' aiding and abetting theory is the absence of any well-plead *facts* demonstrating that Bodie or Oak View had knowledge of the alleged misrepresentations and omissions that form the basis of the fraud claim in Count I. Defendants contend, and perhaps the record will show, that the steps that ultimately

---

[65] Ogus contends that Kaufman's receipt of an equity award "*the day after* the Shareholders Agreement was fraudulently procured is more than sufficient at the pleadings stage to support an inference of knowledge and substantial assistance." Pl.'s Opp'n Br. 27 (emphasis in original). In support of this contention, Ogus cites *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *23-24 (Del. Ch. Dec. 3, 2018). Putting aside that Ogus has not sufficiently alleged a claim of fraud with respect to his execution of the Shareholders Agreement for the reasons discussed previously, the cited section of *Great Hill* addresses the issue of substantial participation and not the issue of knowledge. *See* 2018 WL 6311829, at *23-24.

[66] Pl.'s Opp'n Br. 28 (citing Compl. ¶¶ 137-38).

led to Ogus' termination from the Company and the repurchase of his shares occurred in a completely above board manner. Insofar as Bodie and Oak View are concerned, Ogus simply fails to plead facts demonstrating that they were aware of the allegedly fraudulent conduct by Bloom and Kaufman that states a claim for relief under Count I.[67] Accordingly, Count II fails to state a claim for relief.

## C.     Count III:  Breach of Fiduciary Duty Against Kaufman

Count III asserts that Kaufman breached his fiduciary duty as an officer and the in-house attorney of SportTechie in two ways. First, Ogus asserts that Kaufman "pressured and threatened [Ogus] to cause him to execute conversion and other key documents under arbitrary time constraints and without the advice of independent counsel."[68]  Second, Ogus asserts that Kaufman "intentionally misrepresented information and omitted material information . . . regarding what the effect was on Mr. Ogus of documents he was asking Ogus to sign relating to [his] role at the Company."[69]

The second aspect of Count III is a reprise of the fraud claim against Kaufman and states a claim for relief to the same extent that fraud claim survived as to him.

---

[67] Given the court's conclusion that Count II fails based on the element of knowledge, the court does not consider whether the Complaint sufficiently pleads "substantial assistance."

[68] Compl. ¶ 149.

[69] *Id.* ¶ 150.

20

More specifically, Ogus has pled sufficiently that Kaufman breached his fiduciary duty by making misrepresentations and omitting material facts when asking Ogus to sign documents approving (i) the conversion of SportTechie from an LLC to a corporation and (ii) the appointment of directors to the Board.[70] Count III, however, fails to state a claim for breach of fiduciary duty insofar as it asserts that Kaufman defrauded Ogus concerning the effect the Shareholders Agreement could have on his interests. This is because, as discussed previously, the plain terms of the Shareholders Agreement made it clear that the Company had the option to repurchase Ogus' shares upon the termination of his employment with the Company.

As to the first aspect of Count III, the Complaint alleges that (i) Kaufman sent Ogus documents to implement the conversion around noon on December 29, 2016 and demanded that he sign them by 2:30 p.m. the next day, (ii) Kaufman (and Bloom) told Ogus "[a]t this time . . . that he would retain his managerial authority as

---

[70] *See* Part III.A. Defendants cite *York Linings v. Roach*, 1999 WL 608850 (Del. Ch. July 28, 1999) for the proposition that the portion of a fiduciary duty claim based on fraud must be pled with particularity. As discussed above, the two aspects of the fraud claim that survive here were pled with particularity. Defendants also ask the court to dismiss the fiduciary duty claim to the extent that it is duplicative of the fraud claim. Although the misrepresentation and omission component of the breach of fiduciary duty claim overlaps with the fraud claim in Count I, the court will allow both claims to proceed. *See Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *11 n.59 (Del Ch. 2009) ("I recognize that allowing a fraud claim to proceed because of a fiduciary duty claim generates redundancy[,] . . . [but] this sort of redundancy has been permitted in our jurisprudence.") (citing *Zirn v. VLI Corp.*, 621 A.2d 773 (Del. 1993); *Shamrock Hldgs. of Cal., Inc. v. Iger*, 2005 WL 1377490 (Del. Ch. June 6, 2005)).

21

COO, and remain involved in the day-to-day management of the Company," (iii) Ogus also was told he "would retain the Veto Right over major Company decisions he had possessed before the conversion," (iv) Kaufman told Ogus he "would inhibit Company business if he did not approve the conversion documents in the short turn-around time" and that "Ogus would be personally responsible for any fall-out caused by his delay in giving his consent," (v) the conversion was the first step in a three-step plan that culminated with Ogus' execution of the Shareholders Agreement, and (vi) the day after the Shareholders Agreement was signed, Kaufman entered into an agreement to purchase 611,112 shares of the Company's common stock "on very favorable terms" that Bloom signed on behalf of the Company.[71] Based on these allegations, it is reasonably conceivable that Kaufman, motivated by obtaining a personal benefit if the alleged plan to eliminate Ogus was consummated, breached his fiduciary duty of loyalty by making threats against and bringing undue pressure on Ogus so that he would sign the documents to implement the critical first step of that plan.

Defendants argue that Ogus fails to state a claim with respect to the first aspect of the fiduciary duty claim because "Ogus admits that he was aware of *the fact* of the proposed conversion at least two months before it occurred" which "contradicts

---

[71] Compl. ¶¶ 45, 50, 69, 157.

his allegation of being 'pressured and threatened' to convert the Company."[72]  In particular, defendants focus on how in October 2016, "Mr. Kaufman told Mr. Ogus that the 2016 Operating Agreement was inadequate and urged Mr. Ogus to agree to . . . convert[] [SportTechie] to a Delaware corporation,"[73] and in November 2016, Kaufman and Ogus continued to discuss the potential conversion.[74]  But these discussions of a "conversion" are described in vague terms that do not explain the significance of the potential change in the Company's form.  Thus, they do not negate the reasonable conceivability of a claim that Kaufman improperly threatened and pressured Ogus to approve the conversion shortly after he provided documents to Ogus presumably reflecting the actual terms and potential implications of the transaction.

\* \* \* \* \*

The motion to dismiss Count III is granted in part and denied in part in the manner stated above.

D.    Count IV:  Breach of Fiduciary Duty Against Bodie and Bloom

Count IV asserts that Bodie and Bloom breached their fiduciary duties as directors of SportTechie in essentially three respects, by (i) "withholding

---

[72] Defs.' Opening Br. 23 (emphasis in original).

[73] Compl. ¶ 44-45

[74] *See id.* ¶ 47.

23

information about their plan to strip [Ogus] of authority within the Company," (ii) "improperly purporting to terminate [Ogus'] employment," and (iii) purporting "to repurchase his shares at a price well below fair market value."[75] The court addresses each of these three components of Count IV, in turn, below.

### 1. Withholding Information

The first component of Count IV—withholding information—is a second reprise of the fraud claim, this time against Bloom, which states a claim for breach of fiduciary duty against Bloom for the same reasons and to the same extent that this claim survived against Kaufman.[76] In other words, it is reasonably conceivable that Bloom breached his fiduciary duty by making misrepresentations and omitting material facts in connection with asking Ogus to approve the conversion of SportTechie from an LLC to a corporation and the appointment of directors to the Board, but Count IV fails to state a claim concerning Ogus' execution of the Shareholders Agreement.

---

[75] *Id.* ¶ 156. The header for Count IV asserts a breach of fiduciary duty claim only against Bodie and Bloom but the body of this section of the Complaint references Kaufman several times. *See id.* ¶¶ 155-57, 159. Ogus explains in his opposition brief that whether Kaufman's "conduct is considered as part of Count III or Count IV is of no substantive moment." Pl.'s Opp'n Br. 37. The court analyzed the allegations concerning Kaufman's alleged breach of fiduciary duty in discussing Count III above, and will not repeat that analysis here.

[76] *See* Part III.C.

24

As to Bodie, Count IV fails to state a claim for breach of fiduciary duty because the alleged withholding of information from Ogus with respect to his approval of the conversion and of the appointment of directors to the Board—including the appointment of Bodie—occurred before Bodie became a director of the Company on February 1, 2017.[77] Relying on *Noerr v. Greenwood*,[78] Ogus argues that "[p]rospective directors . . . can be liable for disclosure violations committed in connection with solicitation of equity-holder approval of their election to the board."[79] Although one of the defendants in *Noerr* had been nominated but not yet elected as a director when the challenged proxy statement was circulated,[80] the court did not address whether a director can be subject to fiduciary duties before actually becoming a director. In the absence of any such analysis, the court declines to find that Bodie owed fiduciary duties before her appointment to the Board when she had no legal authority to serve as a director of the Company at that time.

## 2. The Termination of Ogus' Employment

The second component of Count IV asserts that "Bodie and Bloom breached their fiduciary duties to Ogus by signing the consents to terminate [Ogus] without

---

[77] *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 758 (Del. Ch. 2005) ("Delaware law does not require directors-to-be to comply with their fiduciary duties.").

[78] 1997 WL 419633 (Del. Ch. July 16, 1997).

[79] Pl.'s Opp'n Br. 38.

[80] 1997 WL 419633, at *1 n.2.

25

cause."[81]  Citing *Dweck v. Nasser*,[82] defendants argue that this conduct "cannot be a breach of fiduciary duty" because, "[t]o the extent Ogus claims his termination was wrongful, that is a wrongful termination claim, not a breach of fiduciary duty claim."[83]  The court does not read *Dweck* to provide such a categorical rule.

In *Dweck*, the court held that Gila Dweck's allegations of wrongdoing concerning her termination as president and CEO of Kids International Corporation by the company's director and controlling stockholder (Nasser) "are insufficient to support a claim for breach of fiduciary duty."[84]  In reaching this conclusion, however, the court seemed to rely on the lack of any allegations suggesting that Nasser or any other director of the company was acting against the company's best interests in firing Dweck such that there was no reason to interfere with their ability to change the management of the company.  As the court stated:  "Apart from the unenforceable stockholders agreement, there is nothing to suggest that Nasser or any director of Kids' had a fiduciary obligation to leave the management of the business to Dweck."[85]

---

[81] Compl. ¶ 158.

[82] 2005 WL 5756499 (Del. Ch. Nov. 23, 2005).

[83] Defs.' Reply Br. 22 (Dkt. 49).

[84] 2005 WL 5756499, at *5.

[85] *Id.*  The "unenforceable stockholders agreement" refers to a draft agreement governing Dweck's rights as an officer and director of the company that the court found to be unenforceable.  *Id.* at *2.

The court's analysis concerning another personnel decision in that case supports this reading of *Dweck*. Specifically, the court declined to dismiss a claim for breach of fiduciary duty against Nasser for hiring his nephew (Djemal) to replace Dweck. Based on allegations that Djemal was "unsuited to the job," "ha[d] caused substantial disruption at the company," and "ha[d] injured the company's business and prospects," the court concluded that "the complaint sufficiently pleads that the controller did not act in the best interest of the company when he replaced the plaintiff with his allegedly unfit nephew."[86]

Here, the Complaint alleges that Ogus "never received a negative review of his work from his fellow employees nor was he otherwise notified that his performance was lacking," never received "any further explanation for his termination," and was fired "for the sole and improper purpose" of "buy[ing] his shares at a below market price."[87] Ogus also alleges that his "efforts led to increased visibility for the Company, increased readership and partnerships, such as with Sports Illustrated."[88] Based on these allegations, and giving Ogus all reasonable inferences as the court must at this stage of the proceedings, it is reasonably conceivable that Bloom and Bodie terminated Ogus' employment in bad faith simply

---

[86] *Id* at *1, 6.

[87] Compl. ¶¶ 93, 179(k), 188, 191; *see also id.* ¶¶ 71, 88.

[88] *Id.* ¶ 189.

to eliminate his ownership position in the Company for unfair value. This states a claim for breach of fiduciary duty.

### 3. The Repurchase of Ogus' Shares

The third component of Count IV asserts that Bodie and Bloom breached their fiduciary duty by "repurchas[ing] [Ogus'] shares at a price well below fair market value."[89] Defendants argue that the gravamen of this aspect of Count IV is that Ogus received less than fair value for his shares, which should be dismissed because the theory "is precisely the same as" Ogus breach of contract claim in Count IX.[90] The court agrees.

In *Nemec v. Shrader*, our Supreme Court affirmed the dismissal of a breach of fiduciary duty claim involving the redemption of two former officers' shares of the company, finding that the claim was foreclosed by a contract that expressly addressed the parties' dispute even though the company's directors made the decision to redeem the shares:

> It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.

\* \* \* \* \*

---

[89] *Id.* ¶ 156.

[90] Defs.' Opening Br. 28.

Even though the Directors caused the Company to redeem the plaintiffs' shares when it did, the fiduciary duty claim still arises from a dispute relating to the exercise of a *contractual* right—the Company's right to redeem the shares of retired nonworking stockholders. That right was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract. Rather, that right was solely a creature of contract, and attached only to those shares that retired stockholders acquired under the Stock Plan. As a consequence, the nature and scope of the Directors' duties when causing the Company to exercise its right to redeem shares covered by the Stock Plan were intended to be defined solely by reference to that contract. Any separate fiduciary duty claims that might arise out of the Company's exercise of its contract right, therefore, were foreclosed.[91]

Here, Section 6 of the Shareholders Agreement expressly provides that upon the termination of Ogus' employment from SportTechie, the Company has the option to purchase his shares for "an amount equal to the fair market value (as determined in good faith by the Board) of the Shares."[92] The alleged breach of this contractual obligation is the subject of Count IX, discussed below. This is not to say that the Board's decision to terminate Ogus' employment cannot form the basis of a fiduciary duty claim. As discussed in the previous section, Ogus has stated such a claim. Insofar as the question is whether Ogus received fair value for his shares, however, that dispute is squarely addressed by the terms of the Shareholders Agreement—which has a built in requirement that the directors determine fair value

---

[91] *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (citations omitted, emphasis in original).

[92] Compl. Ex. C § 6.2.

in good faith—and cannot form the basis of a separate fiduciary duty claim under the reasoning of *Nemec*.[93] For this reason, this aspect of Count IV fails to state a claim for relief.

* * * * *

The motion to dismiss Count IV is granted in part and denied in part in the manner stated above.

### E.    Count V:  Aiding and Abetting Against Oak View

Count V of the Complaint asserts that Oak View aided and abetted Bodie in breaching her fiduciary duties in the manner set forth in Count IV.[94] The elements

---

[93] *See also Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998) ("[B]ecause the contract claim addresses the alleged wrongdoing by the Board, any fiduciary duty claim arising out of the same conduct is superfluous."); *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. Apr. 7, 2001) (dismissing a fiduciary duty claim because "the contract and fiduciary claims overlap completely since they are based on the same underlying conduct . . . [and] 'relate[s] to obligations 'expressly treated . . . ' by contract'"); *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833-34 (Del. Ch. 2006) (dismissing a fiduciary duty claim when "the complaint asserts contractual and fiduciary duty claims that arise from the same alleged facts and underlying conduct" because "contract, and not fiduciary, principles should govern the analysis"); *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *13-15 (Del. Ch. Aug. 30, 2013) (dismissing a fiduciary duty claim because it is "duplicative of, and foreclosed by, their breach of contract claims").

[94] In its opposition brief, Ogus asserts that Oak View "participated in the breaches by Kaufman and Bloom as well—including encouraging Kaufman's misconduct by promising him a cut of the benefits in the 2016 note." Pl.'s Opp'n Br. 46. Fairly read, the allegations of Count V focus only on Bodie's conduct and seeks to impute only her conduct to Oak View. *See, e.g.*, Compl. ¶¶ 165 ("Bodie breached her fiduciary duties to Plaintiff."), 166 ("The actions and knowledge of Ms. Bodie is imputed to Oak View for the reasons detailed earlier herein.  Thus, Oak View actively participated in the breach of fiduciary duty.").

30

of a claim for aiding and abetting a breach of fiduciary duty are: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[95]

As previously discussed, Count IV contains three components: (i) the withholding of information, (ii) the termination of Ogus' employment, and (iii) the Company's repurchase of Ogus' shares. Because Count IV fails to state a claim for breach of fiduciary duty against Bodie with respect to the first and third components,[96] Count V fails to state a claim for aiding and abetting against Oak View as to those two components as well.

With respect to the second component, for which Ogus has stated a claim against Bodie for breach of fiduciary duty for the reasons discussed in Part III.D and for which defendants do not contest the element of damages,[97] the only open question is whether the Complaint sufficiently alleges that Oak View knowingly participated

---

Accordingly, the court analyzes Count V only with respect to Bodie's alleged breach of fiduciary duty.

[95] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citations, internal quotations, and alterations in original omitted).

[96] *See* Part III.D.

[97] Because defendants did not challenge the damages element of the aiding and abetting claim in their briefs, they have waived the issue. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (issues not briefed are deemed waived).

31

in Bodie's alleged breach of fiduciary duty. "A claim of knowing participation need not be pled with particularity," but "there must be factual allegations in the complaint from which knowing participation can be reasonably inferred."[98]

The Complaint sufficiently alleges that Bodie knowingly participated in the termination of Ogus' employment by signing a written consent of the Board to remove Ogus as an officer of the Company effective March 8, 2017.[99] "A director's knowledge and participation in a breach may be imputed to a non-fiduciary entity for which that director also serves in a fiduciary capacity."[100] Ogus alleges, and defendants do not dispute, that Bodie was serving in a fiduciary capacity at Oak View when she signed the written consent, which follows from the Complaint's allegations that Bodie "served as an officer" of Oak View and was its Vice President of Business Development in 2017.[101] Accordingly, Bodie's knowing participation in the termination of Ogus' employment may be imputed to Oak View. Count V thus states a claim against Oak View for aiding and abetting Bodie's breach of fiduciary duty with respect to terminating Ogus' employment at SportTechie.

---

[98] *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at \*24 (Del. Ch. May 4, 2005) (citation and internal quotation marks omitted).

[99] Compl. ¶¶ 88, 93; *see id.* Ex. F.

[100] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at \*16 (Del. Ch. Mar. 26, 2018) (citing *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006); *Khanna v. McMinn*, 2006 WL 1388744, at \*27 (Del. Ch. May 9, 2006)).

[101] Compl. ¶¶ 19, 162.

The motion to dismiss Count V is granted in part and denied in part in the manner stated above.

### F. Count VI: Civil Conspiracy Against Bodie, Bloom, Kaufman and Oak View

Count VI asserts that Bodie, Bloom, Kaufman, and Oak View engaged in a civil conspiracy to allow Oak View to gain control of SportTechie through Oak View's purchase of a secured convertible note and the subsequent implementation of a multi-step plan that forced Ogus out of the Company and allowed it to repurchase his shares "at below market price."[102] The elements for civil conspiracy are: "(i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties."[103]

With respect to the first element, "[e]ven to prevail at trial the [plaintiff does] not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators."[104] "[T]o survive a motion to

---

[102] *Id.* ¶¶ 178-80.

[103] *Great Hill*, 2014 WL 6703980, at *20.

[104] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009) (citing *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 97 n.16 (Del. 2006)); *see also LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018).

dismiss, all that is needed is a reasonable inference that [the defendant] was part of this conspiracy."[105]

Here, the Complaint alleges, in sum, that: (i) Oak View, through Bodie, invested in SportTechie in October 2016 expecting to make a further investment in and obtain control of the Company;[106] (ii) Bodie publicly stated in November 2016 that members of Oak View would have "first dibs" on SportTechie;[107] (iii) Bloom, Kaufman, and Bodie (acting together in various combinations) thereafter (a) converted the LLC into a corporation, which eliminated Ogus' Veto Right and gave the Board the authority to terminate Ogus' employment; (b) created a Board friendly to Oak View that excluded Ogus; (c) procured a Shareholders Agreement allowing the Company to repurchase Ogus' shares upon the termination of his employment; (d) terminated Ogus' employment; and (e) repurchased his shares at an allegedly unfair price.[108] These allegations, and the rather rapid pace at which the sequence of events necessary to implement the alleged plan occurred, support a reasonable inference of a confederation among Bodie, Bloom, Kaufman, and Oak View.[109]

---

[105] *Am. Int'l Grp*, 965 A.2d at 806.

[106] Compl. ¶¶ 40-41, 77.

[107] *Id.* Ex. B at 5.

[108] Compl. ¶¶ 45, 47, 48, 65, 67, 88, 94, 102.

[109] Defendants devote several pages downplaying the significance of certain events, asking the court to draw different inferences about them, and challenging the alleged conspiracy as "nonsensical" and "farfetched." *See* Defs.' Reply Br. 28-30. Defendants make many

34

The second element of a civil conspiracy claim—an unlawful act in furtherance of the conspiracy—also has been pled sufficiently. As discussed above, Ogus has stated claims for fraud and/or breach of fiduciary duty against each of the three individual defendants concerning various acts they each took (acting together in various combinations) in furtherance of the alleged conspiracy.[110] Finally, Ogus alleges he has suffered damages as a result of the conspiracy,[111] which defendants do not challenge in their briefs.[112]

For the foregoing reasons, the motion to dismiss Count VI of the Complaint is denied.

## G. Count IX: Breach of the Shareholders Agreement Against SportTechie

Count IX asserts that the Company "breached the Shareholders Agreement by failing to determine in good faith the fair market value of the Company in connection

---

valid points. The procedural posture of the motion, however, only requires that Ogus plead facts to support a reasonable inference of a confederation, which he need not do with particularity. *Great Hill*, 2014 WL 6703980, at *20 ("The existence of a confederation may be pled by inference; it is not subject to the specificity requirement of Rule 9(b)."). Ogus has satisfied that hurdle, albeit not overwhelmingly.

[110] *See* Parts III.A, C, D.

[111] Ogus alleges he "has suffered, and will continue to suffer, harm" as a result of the conspiracy, which led to his termination and the resulting acquisition of his 44.5% equity interest in SportTechie "at below market prices." Compl. ¶¶ 177, 183.

[112] *See Emerald Partners*, 726 A.2d at 1224 (issues not briefed are deemed waived).

with the . . . repurchase of [Ogus'] shares."[113]  Focusing on the Derivatas report, the Complaint alleges that it "contained notations and assumptions that were inconsistent with Defendants' own representations regarding the treatment of $750,000 of convertible notes, SportTechie's relationship with Oak View Group and its future investments, and the overall value of the Company."[114]

As discussed above, under Section 6 of the Shareholders Agreement, the Company had the option to purchase Ogus' shares upon the termination of his employment from the Company for "an amount equal to the fair market value (as determined in *good faith* by the Board)."[115]  Noting that the Complaint refers to the Derivatas report that set the price for Ogus' shares, defendants argue that Count IX should be dismissed because, even if there were flaws in the report, the Board members were entitled to rely on it under 8 *Del. C.* § 141(e).[116]

By invoking Section 141(e), which can protect directors of Delaware corporations from liability if the directors reasonably rely in good faith on the opinion of expert advisers,[117] the Company essentially is asserting an affirmative

---

[113] Compl. ¶ 214.  Count IX is asserted in the alternative "if the Shareholders Agreement is found not have been induced by fraud." *Id.*

[114] *Id.* ¶ 218.

[115] *Id.* Ex. C § 6.2 (emphasis added).

[116] Defs.' Opening Br. 49-50.

[117] Section 141(e) provides, in relevant part, that "[a] member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good

defense against its own potential liability under the Shareholders Agreement. The Company thus should bear the burden of proof to demonstrate that the directors' reliance on the Derivatas report was reasonable and done in good faith.[118] Defendants have not put forward evidence to make this showing, which is a fact-intensive inquiry that is not appropriate for disposition in the context of a motion to dismiss under Court of Chancery Rule 12(b)(6).

On the issue of the Board's good faith in determining the purchase price for his shares, Ogus alleges that the Derivitas report stated that "there has been no contact with any potential investors" to raise additional funds but that the defendants knew that this assumption was false.[119] This is so, according to Ogus, because "Derivatas had been told that there had been no contact with investors or arrangements with them for investments after the investments made in October 2016," when in fact, "between 2017 and 2018 [SportTechie] had discussions with

---

faith upon the . . . opinions, reports or statements presented to the corporation by any . . . person as to matters the member reasonably believes are within such . . . person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." 8 *Del. C.* § 141(e).

[118] *See Medek v. Medek*, 2008 WL 4261017, at *10 n.88 (Del. Ch. Sept. 10, 2008) ("Defendants have the burden of proof on each of their affirmative defenses.") (citing *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *5 n.40 (Del. Ch. Dec. 15, 2005)).

[119] Compl. ¶ 74.

'numerous potential investors.'"[120]   The omission of this information allegedly "lowered the valuation."[121]   Based on these allegations, it is reasonably conceivable that the Board knew that the Derivatas report contained a false assumption such that the Company's purchase of Ogus' shares did not satisfy the good faith standard embedded in Section 6 of the Shareholders Agreement.[122]   Accordingly, Count IX states a claim for relief.

## IV.   CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendants' motion to dismiss the seven claims in the Complaint discussed above. Counsel are directed to confer and to submit a form of implementing order consistent with this decision within five business days.

**IT IS SO ORDERED**.

---

[120] *Id.* ¶¶ 74, 80.  Although the Complaint is not a model of clarity, the court infers that this assumption came from discussions Bloom and/or Kaufman had with Derivatas.  *See id.*

[121] *Id.* ¶ 80.

[122] Defendants contend that Ogus' allegations that the Company had been in contact with investors is erroneous because a complaint the Company filed in the United States District Court for the District of Maryland, which is cited in paragraph 74 of the Complaint as factual support for Ogus' allegations, only refers to contacts with investors occurring *after* Ogus' termination.  *See* Defs.' Opening Br. 33-34.  This assertion presents a factual dispute that cannot be resolved at this stage of the case because it is unclear from the Complaint that this was the only source for Ogus' allegations of contacts with investors.